UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| JAMIE S. ANGLEMYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:12-CV-486-CAN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On September 5, 2012, Plaintiff Jaime S. Anglemyer, ("Anglemyer") filed a Motion for judicial review in this Court requesting reversal or remand of the decision of the Commissioner denying Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). On April 26, 2013, Anglemyer filed his opening brief and, on August 2, 2013, Carolyn Colvin, the acting Commissioner of the Social Security Administration, ("Commissioner") responded. Anglemyer filed a reply brief on August 29, 2013. This Court may enter a ruling in this matter based on the parties' consent, 28 U.S.C. § 636(c), and 42 U.S.C. §§ 405(g) and 1383(c)(3).

**I.  PROCEDURE**

On August 24, 2009, Plaintiff, Jaime S. Anglemyer, filed applications for SSI and DIB, alleging that he had become disabled on June 30, 2008, due to symptoms associated with a head injury, a back injury, and hip problems. Anglemyer later amended his alleged disability onset date to August 24, 2009. His applications were denied initially on December 21, 2009, and upon

---

[1] Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)1 of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as Defendant in this suit.

reconsideration on March 1, 2010. On March 30, 2010, Anglemyer filed a written request for a hearing, which occurred on April 18, 2011. Anglemyer appeared at the hearing with counsel and testified before an administrative law judge ("ALJ"). A vocational expert ("VE") also testified at the hearing.

On July, 22, 2011, the ALJ issued an opinion denying Anglemyer's request for benefits. The ALJ found that Anglemyer had not engaged in substantial gainful employment at any time since the onset date of his alleged disability. The ALJ then concluded that Anglemyer suffered from the following severe impairments: degenerative disc disease, sleep apnea, personality disorder, depression, and obesity. However, the ALJ also found that none of Anglemyer's severe impairments or combination of impairments met or medically equaled any of those included in the Listing of Impairments at 20 C.F.R. pt. 404, subpt. P., app. 1. The ALJ found that Anglemyer's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible and determined that Anglemyer retained the residual functional capacity ("RFC") to perform a full range of unskilled, light work.[2] Based on this finding, the ALJ found that Anglemyer could not perform any of his past relevant work, but could perform jobs that existed in significant numbers in the national economy. Therefore, the ALJ determined that Anglemyer was not disabled and that his claim for benefits should be denied.

On August 14, 2012, the Appeals Council denied Anglemyer's request for review of the ALJ's decision. This made the ALJ's decision the final decision of the Commissioner. *See* C.F.R. §§ 404.981, 416.1481.

## II.     RELEVANT BACKGROUND

### A.     Facts

---

[2] Light work "involves lifting nor more than 20 pounds at a time with frequent lifting or carrying objects weighting up to 10 pounds." 20 C.F.R. § 416.967(b). Light work may require a good deal of walking or standing or involve sitting most of the time with some pushing and pulling of arm and leg controls. *Id.*

Anglemyer was 44 years old at the time of the ALJs decision. Anglemyer is approximately five feet, six inches tall and two hundred and forty pounds. Anglemyer completed tenth grade, but did not obtain a GED. He is married and resides with his wife and a female roommate for the purposes of paying the bills.

During the last fifteen years, Anglemyer worked full time as a temporary worker, arc welder, or trailer assembler. Anglemyer received vocational training at a career center. In 2008, Anglemyer was working as a temporary worker until he sustained a head injury after falling out of a truck at work. Anglemyer's resulting head injury caused concentration and memory problems. Anglemyer had also worked as a welder and as a trailer assembler. Anglemyer exhausted his unemployment benefits after he stopped working. Since his last job, Anglemyer has looked for new employment and explored the possibility of returning to school to learn a new trade, both to no avail.

### B. Medical Background

Anglemyer's medical records date back to October 26, 1991, when he saw Dr. Paul Yoder at Oaklawn Psychiatric Center ("Oaklawn") for a psychological evaluation and treatment. Anglemyer's therapist, Robert Wert, ACSW, had referred him to Dr. Yoder, as had the court in response to criminal charges that Anglemyer faced at that time. Dr. Yoder noted that Anglemyer had "a long history of troubled behavior and emotional problems." (Tr. 250). Anglemyer underwent testing that yielded diagnoses of Post Traumatic Stress Disorder ("PTSD"), cannabis dependence, dysthymia[3], major depression, personality disorder, and developmental arithmetic

---

[3]Dysthymia is a chronic form of depression where a person's moods are regularly low. However, these symptoms are not as severe as they would be with major depression. *See Dysthymia*, http:www.nlm.nih.gov/medlineplus/ency/article/000918.htm (last visted November 12, 2013).

and reading disorders. Then in 1999, Anglemyer was again treated at Oaklawn for major depression, cannabis dependence, and personality disorder. In August of 1999, Dr. Yoder noted that Anglemyer had been upset that his disability application had been denied but that he needed treatment compliance before he could qualify for disability. In 2002, Anglemyer applied for Medicaid benefits and consequently underwent further evaluation by Linda Bertsche, a psychiatric clinical nurse specialist, who diagnosed him with psychotic disorder NOS, a history of alcohol and cannabis dependence in full remission, and personality disorder NOS. Bertsche, however, listed a Rule PTSD diagnosis suggesting a lack of certainty at that time as to whether a PTSD diagnosis was accurate.

Anglemyer's record also shows treatment on July 15, 2009, at the emergency room for headaches and back pain. Anglemyer told the emergency room doctor, Eugene Huang, M.D., that he believed that his headaches and back pain were the result of a fall from a truck at work about a year and a half earlier. Anglemyer thought the fall may have been caused by a seizure. Anglemyer stated that he experienced pain two times a week at first, but the pain increased in frequency to daily pain. Dr. Huang's exam of Anglemyer showed lower back discomfort/numbness but no point tenderness or other conditions. Furthermore, a CT scan performed revealed no acute abnormalities to Anglemyer's head.

On July 17, 2009, Anglemyer began to see a primary care physician, Dr. Pranjalkumar Patel. During this visit, Anglemyer did not report any difficulties with light sensitivity or headaches, but did say he had "mild headache[s] off and on." (Tr. 271–72). Anglemyer also informed Dr. Patel that he may have had a seizure the day before his visit. Nonetheless, Dr. Patel noted headaches, possible migraines, possible seizure activity, and rectal bleeding possibly from

4

hemorrhoids. Dr. Patel referred Anglemyer to a neurologist and gastroenterologist for further evaluation and ordered an electroencephalogram ("EEG"). Anglemyer, however, refused to seek further evaluation despite Dr. Patel's warning about the possible outcomes.

On October 30, 2009, Dr. Randal Horton, a state agency psychological consultant, completed Psychiatric Review Technique and Mental Residual Functional Capacity Assessment forms regarding Anglemyer. Dr. Horton opined that Anglemyer was able to "drive, give rides, do chores, prepare some meals, maintain hygiene, shop, handle money, engage in leisure interests, socialize, and has within normal limits in regards to comprehension/attention." (Tr. 292). Furthermore, Horton noted that Anglemyer was primarily limited by physical issues and had the ability to do 2-3 step command work within physical parameters.

On October 27, 2009, Anglemyer began to see a new primary care physician, Dr. Paul Buller. As he had with other doctors, Anglemyer mentioned his headaches and back pain from the fall. However, Anglemyer added that he was taking Motrin and Tylenol "like candy" and it was not relieving his pain. Dr. Buller prescribed Tylenol 3 for Anglemyer's low back pain. Anglemyer returned to Dr. Buller on January 22, 2010, seeking a prescription refill.

On December 5, 2009, Anglemyer saw Joe Banks, D.O., for a physical consultative examination related to his disability application. He complained of daily headaches and back pain radiating into his left leg. Banks observed a diminished range of motion in the lumbar spine secondary to pain. On December 19, 2009, consultative examiner Dr. R. Bond, completed a Physical RFC Assessment form in which he concluded that Anglemyer could occasionally lift/carry 50 pounds and frequently lift/carry 25 pounds, and sit, stand, or walk fo rsix hours in an

eight-hour day. Bond indicated no limitations from Anglemyer's headaches or seizures, and imposed no environmental limitations.

In 2010, Anglemyer visited the emergency room in March, July, and October complaining of headaches, backpain, right knee pain, a sprained ankle, as well as his previously documented conditions. The doctor's notes from July show that Anglemyer reported several new complaints causing the doctor to refer him to a new primary care physician after learning that Anglemyer's previous physician would no longer see him for payment issues. Anglemyer never followed up with the new doctor. In October, Anglemyer reported difficulty breathing leading to a diagnosis of COPD. After each visit, Anglemyer was sent home with medication.

On July 1, 2010, after having ongoing symptoms of depression with thoughts of suicide, Anglemyer returned to Oaklawn where he saw Dr. Timothy McFadden. Dr. McFadden learned that Anglemyer was taking care of two women, his girlfriend at the time who is now his wife and another female roommate both of whom were on disability. In his notes, Dr. McFadden commented that he believed Anglemyer was motivated by his wife's and his roommate's disability at times. Dr. McFadden also noted that Anglemyer had normal speech and fair eye contact as well as logical thought processes with judgment rated at his baseline. Dr. McFadden diagnosed Anglemyer with major depressive disorder, recurrent, with psychotic features, PTSD, and personality disorder NOS with antisocial, borderline, and dependent features. Dr. McFadden attributed this to chronic distress, paranoid thoughts, and PTSD-type symptoms. Even though Anglemyer's wife corroborated his low mood, anxiety, and frequent nightmares, Dr. McFadden still expressed "some concerns about the motivation for disability" and noted Anglemyer's lack of follow-up with his doctors. (Tr. 378).

To address sleep problems, Anglemyer visited the Northeastern Center on October 22, 2010, where he saw Bonnie Pearson, a clinical nurse specialist, who diagnosed primary insomnia, borderline personality disorder, and histrionic personality disorder. At the visit, Anglemyer reported that he had taken a friends' medications to help him sleep but he did not like the side effects. Pearson told Anglemyer that it is not normal for people to take other people's medication, especially strong sleeping medication. She also noted that she found it difficult to believe what Anglemyer was trying to tell her because of his normal mental status and ability to perform the tasks she asked of him. Furthermore, Pearson gave a guarded prognosis in that she believed that Anglemyer was "trying to play the system" and "looking to get any kind of benzodiazepines or illegal substances that he can get his hands on." (Tr. 353).

On January 12, 2011, Anglemyer began physical therapy for his back pain. Anglemyer had some pain and tenderness during the physical therapy but his muscle strength and sensation were full and intact. The therapist noted that Anglemyer had some radicular symptoms, but no objective neurologic findings on the exam. Anglemyer stated at the ALJ hearing that he attended physical therapy for seven weeks; however, there is nothing in the record to support his claim.

On January 31, 2011, Anglemyer saw Dr. Jody Neer for a neurological consultation regarding his seizure activity in particular. This examination showed normal neurological and musculoskeletal functions. Dr. Neer noted after reviewing the EEG and diagnosing the seizure disorder that the disorder would be "totally and presently disabling" and it would be unlikely that Anglemyer could maintain meaningful employment. (Tr. 422). However, Dr. Neer opined that he believed that the seizures were caused by a suspected condition of obstructive sleep apnea. Dr. Neer recommended that Anglemyer undergo a sleep study and be sent for an MRI.

Following an unremarkable MRI performed on February 5, 2011, Anglemyer underwent a sleep study on February 15, 2011, which confirmed the suspected sleep apnea diagnosis. The doctor suggested that Anglemyer lose some weight and quit smoking to help to resolve his sleep apnea. Anglemyer's last medical visit on the record was a return to Dr. Buller to get his disability paperwork completed.

### C.     Claimant's Daily Activity Testimony

At the ALJ hearing, Anglemyer testified with specificity about his typical daily activities. Anglemyer stated he usually woke up at 8:00 a.m. and got himself ready with some difficulty. Anglemyer further stated that he also takes his medications in the morning and then takes his dog outside. Anglemyer said he usually stays inside watching television until about lunchtime after which he eats lunch and then resumes watching television. Anglemyer states the only time he leaves is when his wife has a doctor's appointment or he has an appointment. Anglemyer indicated that he does the driving for both his wife and himself. Between 3:00 p.m. and 5:00 p.m. is usually when Anglemyer and his wife eat dinner, which they take turns cooking. Anglemyer said that he does not do the dishes because he is not able to stand at the sink that long. Anglemyer indicated that after the evening meal, he returns to watching television until he goes to bed. Anglemyer said his bedtime can range from 5:00 p.m. to midnight and that he uses his C-PAP to sleep. Anglemyer noted that he had problems dressing, showering, and shaving, which required his wife's assistance . As to grocery shopping, Anglemyer explained that he drives his wife and roommate to the store and then waits in his vehicle while they shop. Anglemyer admitted that he is able to do the laundry and sweep occasionally. Anglemyer said he has no hobbies because of his fear to do anything.

Anglemyer estimated that he could lift at most a gallon of milk. He also estimated that he could only walk for five minutes at a time, at most, but that he could repeat this about five to seven times during a standard eight-hour work day. Anglemyer said he could stand for similar amounts of time. Anglemyer also indicated that he could not sit in a straight backed chair for very long. Despite these limitations, Anglemeyer testified that he has no problems with driving.

## III.   ANALYSIS

### A.   Standard of Review

The Social Security Act authorizes judicial review of decisions of the agency. The court will uphold the decision of the agency as long as the ALJ's decision is supported by substantial evidence and free of legal error. 42 U.S.C § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence is more than a scintilla and means such relevant evidence as a reasonable mind might accept to support such a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1972). A reviewing court must not substitute its own opinion for that of the ALJ's or re-weigh the evidence, resolve conflicts in the record, or decide questions of credibility. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). An ALJ decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. If an error of law is committed by the Comissioner, then the "court must reverse the decision regardless of the volume of the evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780,782 (7th Cir. 1997).

The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: 1) the claimant is presently employed; 2) the claimant has a severe impairment or combination of impairments; 3) the

9

claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; 4) the claimant's RFC leaves him unable to perform his past relevant work; and 5) whether the claimant can perform other work in the national economy given the claimant's RFC, age, education, and experience. *Briscoe*, 425 F.3d at 352; 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 20 C.F.R §§ 416.920(a)(4)(i)-(v).[4] If the ALJ can find that the claimant is not disabled at any step, he does not go on to the next step. 20 C.F.R. §§ 404.1520(a)(4).

In his decision, an ALJ must, at a minimum, provide the rationale for his decision or otherwise provide analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that he considered the important evidence. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ is not, however, required to address "every piece of evidence or testimony in the record," but rather provide some insight into the reasoning behind the decision to deny benefits. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 1002. "If reasonable minds could differ about the disability status of a claimant, the Court must affirm the Commissioner's [decision] if it is adequately supported." *Elder v. Astrue*, 529 F3d 408, 413 (7th Cir. 2008).

B.    **Issues for Review**

In this case, Anglemyer raises two major issues for review. First, Anglemyer contends that substantial evidence does not support the ALJ's RFC determination because (1) the ALJ failed to account for all of Anglemyer's physical and mental impairments in his opinion and (2)

---

[4]The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1504 *et. seq.* The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et. seq.* For convenience, only the DIB regulations will be cited henceforth in this opinion.

the ALJ failed to account for Anglemyer's deficiencies in concentration, persistence, and pace in reaching that RFC. Second, Anglemyer contends that the ALJ's conclusion at step five that significant numbers of job exist in the national economy that Anglemyer can perform despite his limitations is not supported by substantial evidence. Specifically, Anglemyer argues that the ALJ improperly relied upon the Medical-Vocational Guidelines ("the Grids") at step five rather than presenting his non-exertional limitations to the VE to generate testimony sufficient to satisfy the step five requirements.

### 1. The RFC is supported by substantial evidence.

A claimant's RFC demonstrates his ability to do physical and mental work activities on a sustained basis despite functional limitations caused by any medically determinable impairments and their symptoms, including pain. 20 C.F.R. § 404.1545; SSR 96–8p 1996. In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the case record, including evidence of functional limitations resulting from nonsevere impairments. 20 C.F.R. § 404.1545; *see also Craft v. Astrue,* 539 F.3d 668, 676 (7th Cir.2008). Relevant evidence may include medical signs, diagnostic findings, the claimant's statements about the severity and limitations of symptoms, statements and other information provided by treating or examining physicians and psychologists, and third party witness reports. SSR 96–7p 1996. The claimant carries the burden of providing medical evidence showing how her impairments affect her functioning. 20 C.F.R. § 404.1512(c).

#### a. The ALJ considered all of Anglemyer's impairments.

Anglemyer contends that the ALJ failed to account for his diagnoses of PTSD, psychotic disorder, headaches, right knee pain, COPD, or hip pain in the RFC and how those impairments

11

affected his ability to sustain the exertional and mental demands of performing the full range of unskilled, light work. Discussion of a claimant's diagnoses in an ALJ's opinion without an explanation of how the resulting functional limitations affected the RFC determination fails to create the logical bridge necessary to ensure meaningful review of the ALJ's opinion. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). An ALJ need not mention every piece of evidence in the record, but must connect the evidence to the conclusion. *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010); *Simila v. Astrue,* 573 F.3d 503, 516 (7th Cir. 2009); *Zurawski,* 245 F.3d at 888–89. The ALJ did just that in this opinion despite Anglemyer's claims to the contrary.

First, the ALJ described with particularity all of the incidents of medical treatment for each of the allegedly unaccounted for diagnoses. Along with those descriptions, the ALJ provided information on Anglemyer's claimed symptoms, medical testing results as to those complaints, and explanations for the weight, often limited, he accorded each set of medical data. Second, after his lengthy review of the medical data included in the record on the diagnoses here at issue, the ALJ then concluded the RFC section by articulating the reasons why the diagnoses failed to result in limitations on Anglemyer's RFC beyond those incorporated into the unskilled, light work category. Specifically, the ALJ noted the "numerous unremarkable physical examinations of record, none of which provide clinical or objective support for these extreme limitations." Doc. No. 10 at 34. As to Angelmyer's mental limitations, the ALJ referenced inconsistencies between Anglemyer's testimony and reported symptoms and the medical record as well as some inconsistencies within the doctors' reports. The ALJ also pointed to evidence that Anglemyer's motive for disability was questionable and his history of histrionics related to symptoms often easily managed through medication. The ALJ also mentioned that Anglemyer's

most recent diagnoses were limited to insomnia and personality disorders. In addition, the ALJ mentioned Anglemyer's history of noncompliance as well as the consultative examiners' conclusions that Anglemyer's activities of daily living were limited primarily by physical, not mental, issues and that his comprehension and attention were within normal limits.

After his thorough review of Anglemyer's longitudinal medical record and his description of the breadth of issues affecting the determination of Angelmyer's limitations, the ALJ assigned the RFC of full range of unskilled, light work—an RFC more limited that the one recommended by a consultative examiner—based on the evidence confirming Anglemyer's many slight limitations. Anglemyer may not agree with the weight the ALJ decided to place on the impairments at issue, but the Court cannot reweigh the evidence itself. Because the ALJ accounted for the symptoms related to all of Anglemyer's diagnoses, including PTSD, psychotic disorder, headaches, right knee pain, COPD, and hip pain, in the assigned RFC, the Court must affirm this aspect of the ALJ's opinion.

> b. **The ALJ accounted for deficiencies in concentration, persistence, and pace.**

Anglemyer also challenges the ALJ's RFC determination by arguing that it is inconsistent with the ALJ's own findings at Step Three noting Anglemyer's moderate difficulties with concentration, persistence, and pace due to his severe mental impairments of personality disorder and depression. At Step Three, the ALJ must assess the severity of the functional limitations imposed by the claimant's severe mental impairments when determining whether those severe mental impairments meet or equal a Listing to qualify the claimant for disability benefits. *See* 20 C.F.R. 404, Subpart P, App. 1, § 12.00. One part of this Step Three analysis is consideration of the "paragraph B" criteria, which include the four broad areas of (1) activities

13

of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The decision must also incorporate "a specific finding as to the degree of limitation in each of the functional areas." 20 C.F.R. § 404.1520a(e)(4). For the ALJ, the issue is not the existence of these conditions but rather their severity and whether they have caused such severe functional limitations so as to prevent a person from working full time. *Carradine v. Barnhart,* 360 F.3d 751, 754 (7th Cir. 2004). Said another way, the diagnosis of an impairment does not establish the severity of the impairment and its resulting limitations. *Estok v. Apfel*, 152 F.3d 636, 639 (7th Cir. 2004).

Anglemyer does not question the ALJ's determination that his severe mental impairments did not meet a Listing at Step Three. Instead, Anglemyer notes the ALJ's finding in his paragraph B analysis at Step Three that Anglemyer suffers from moderate difficulties in concentration, persistence, and pace. The ALJ's finding was based upon Anglemyer's testimony about difficulties with concentration, following instructions, staying on task, and his need for special supervision when working. The ALJ also cited medical testing showing below average intellectuality ability resulting in average cognitive difficulties despite intact memory and logical thought processes. Anglemyer then argues that the ALJ failed to incorporate these moderate difficulties into his RFC. As a result, Anglemyer contends that the RFC is not supported by substantial evidence and that the wrong RFC was used at Step Five of the analysis causing an inappropriate finding of "not disabled," preventing Anglemyer from receiving disability benefits.

In support of his argument, Anglemyer relies solely upon *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010). *O'Connor-Spinner* addresses the proper content of hypotheticals presented to VEs during hearings to assist the ALJ in making the Step Five decision as to the

14

number of jobs available to a claimant based on limitations on work identified through the RFC.
Specifically, the court in *O'Connor-Spinner* stated that "the most effective way to ensure that the
VE is apprised fully of the claimant's limitations is to include all them directly in the
hypothetical." *Id.* at 619. However, Anglemyer's reliance on *O'Connor-Spinner* is misplaced in
considering whether the ALJ incorporated Anglemyer's moderate difficulties of concentration,
persistence, and pace into the RFC. *O'Connor-Spinner* might be applicable if the ALJ had
actually presented a hypothetical to the VE. He did not. Instead, the ALJ relied on the Medical-
Vocational Guidelines at Step Five, which will be discussed below.

To determine whether *O'Connor-Spinner* would be applicable at Step Five, the Court
must determine whether the ALJ's RFC determination is supported by substantial evidence.
Again, the ALJ must take into account all of a claimant's limitations from severe and nonsevere
impairments as evidenced in the record as whole when determining an RFC. Failure to
incorporate the limitations from mental impairments that constituted Anglemyer's moderate
difficulties in concentration, persistence, and pace could be problematic and sufficient to support
remand. Yet in this case, the ALJ considered Angelmyer's moderate difficulties in
concentration, persistence, and pace as evidenced in his decision by reliance upon the opinions
of the state agency psychological experts, including Dr. Randal Horton and careful consideration
of other factors related to Anglemyer's functional limitations. First, the ALJ specifically noted
Dr. Horton's assessment that Angelmyer would still be able "to do 2-3 step command work
within physical parameters" despite his moderate difficulties in concentration, persistence, and
pace. Doc. No. 10 at 36. Second, as discussed earlier, the ALJ also carefully considered
evidence of Anglemyer's inconsistencies, motive, histrionics, recent mental diagnoses,

noncompliance, comprehension, and attention in the record when determining that Anglemyer could perform the full range of unskilled, light work[5].

Anglemyer contends that "learning tasks involving 1-3 steps and having limited concentration are two different things." Doc. No. 29 at 4. Even if that is true, Anglemyer has not provided this Court with any evidence in the record to counter the opinions of the psychological consultants or the evidence showing other factors mitigating any limitations from Anglemyer's mental impairments. Therefore, the Court is left with an ALJ's opinion that thoroughly reviews, considers, and references the longitudinal record as a whole in determining Anglemyer's RFC. As such, the ALJ's RFC determination is supported by substantial evidence.

### 2. The ALJ's determination that a significant number of jobs exist in the national economy that Anglemyer can perform despite the limitations identified in his RFC is supported by substantial evidence.

Having determined that the ALJ's RFC determination is supported by substantial evidence, the ALJ then found that Anglemyer is unable to perform any past relevant work—a finding that Anglemyer does not challenge. However, Anglemyer does challenge the ALJ's determination at Step Five that there are a significant number of other jobs available that he can perform in light of his RFC. In assessing whether jobs exist for a claimant like Anglemyer, the ALJ must consider thte claimant's RFC, age, education, and experience. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The ALJ must reach his conclusion by using the Medical-Vocational Guidelines, also referred to as the "Grids," or by consulting a vocational expert.

---

[5] Pursuant to 20 C.F.R. § 404.1568(a), unskilled work is defined as:
    work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time . . . . [W]e consider jobs unskilled if . . . a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.

16

In Anglemyer's case, the ALJ used the Grids. The Grids consist of a series of charts that divide exertional work into categories: sedentary, light, medium, heavy, and very heavy. 20 C.F.R. Part 404, Subpart P, App. 2, §§ 201.11-204.00. The Grids allow the ALJ at Step Five to take administrative notice of the number of unskilled jobs available in the national economy based upon the claimant's exertional limitations, age, education, and work experience. *Heckler v. Campbell*, 461 U.S. 458, 467–68. If a claimant fits into a Grid category based on his RFC, the Grids determine whether a claimant is found to be "disabled" or "not disabled" . *Id.*; 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(c). However, when there are both exertional and nonexertional limitations in a claimant's RFC, the ALJ may not rely solely on the Grids to reach a final decision on whether the claimant is "disabled" or "not disabled." *Villano v. Astrue*, 556 F.3d 558, 564 (7th Cir. 2009); *see also Fast v. Barnhart*, 397 F.3d 468, 471 (7th Cir. 2005). Rather, the ALJ should consult a vocational source, such as a VE, to determine whether the non-exertional limitations change the conclusion suggested by the Grids. *Villano*, 556 F.3d at 564. In this instance, the ALJ applied the Grid rule 202.18 to conclude that Anglemyer is not disabled. Rule 202.18 provides that an individual between the ages of 18 through 49 who has a limited or less education, with skilled or semiskilled previous work experience, but no transferable work skills, is deemed not disabled. *See* 20 C.F.R. pt. 404, subpt. P, App. 2.

Anglemyer contends that it was improper for the ALJ to apply the Grids because his RFC included the non-exertional limitation of "unskilled work." In the context of the Grids, all jobs considered are unskilled. *See* 20 C.F.R. pt. 404, subt. P, app 2 § 200.00(b). Therefore, the Step Five analysis of Anglemyer's RFC cannot hinge on the fact that he was limited to unskilled work because the Grids already account for this. Consequently, because the ALJ's RFC determination

17

was supported by substantial evidence, the ALJ properly applied the Grids to conclude that Anglemyer is able to perform a significant number of jobs in the national economy and is not disabled. As such, the ALJ's Step Five determination is supported by substantial evidence and the Court need not consider the content of the VE's testimony further.

## III. CONCLUSION

For the reasons stated above, the Court concludes that the ALJ's RFC determination and his Step Five determination as to the availability of jobs that Anglemyer can perform are supported by substantial evidence. Therefore, the Court **AFFIRMS** the ALJ's decision. The Clerk is **INSTRUCTED** to enter judgment in favor of the Commissioner.

**SO ORDERED.**

Dated this 2nd day of April, 2014.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge